# IN THE COURT OF APPEALS OF IOWA

No. 21-0462
Filed September 1, 2021

**IN THE INTEREST OF J.R. and L.R.,**
**Minor Children,**

**A.R., Mother,**
        Appellant.

_____

Appeal from the Iowa District Court for Johnson County, Deborah Farmer Minot, District Associate Judge.

The mother appeals from the modification of the dispositional order, removing the children from her custody. **AFFIRMED.**

Joseph C. Pavelich of Spies and Pavelich, Iowa City, for appellant mother.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Kelly D. Steele, Cedar Rapids, attorney and guardian ad litem for minor children.

Considered by Tabor, P.J., and Greer, J., and Doyle, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2021).

**GREER, Judge.**

The mother of J.R. and L.R., born in 2013 and 2015 respectively, appeals from the modification of the dispositional order that removed the children from her care. She argues the juvenile court was wrong in its determination the children would be subjected to adjudicatory harm if left in her care, as the risk of harm comes from the children's father, who was then in police custody. Additionally, she challenges the court's credibility findings, suggesting we should view her decision to allow the children's father access to them as akin to a drug relapse rather than proof she has not made the necessary progress to keep the children safe.

**I. Background Facts and Proceedings.**

The Iowa Department of Human Services (DHS) became involved with this family in June 2018, after police were called to the family home due to a physical altercation between the parents while the children were present. While in the home, the officers found a number of "stamp bags" with prescription pills in them, including in a fanny pack the mother was then wearing. The mother was arrested, and a criminal no-contact order was entered preventing the mother from having contact with the father or the children except as authorized by DHS. DHS later issued founded child-abuse reports based on the incident.

The court removed the children from the father's care in November after the mother was observed spending time with L.R. alone—without the approval of DHS and in violation of the no-contact order. When asked, one of the children reported they had been seeing the mother frequently and mentioned the mother sleeping at

the family home with them. The children were placed with their maternal aunt's family.

As the court and DHS became more involved with the family, the scope of the family dysfunction became more clear. The parents each alleged the other had ongoing issues with abusing prescription drugs. The mother had previously attempted suicide, and the father had a serious drug overdose out of state. There were also financial issues, due at least in part to the mother's gambling.[1] The father claimed the mother was the aggressor in multiple instances of domestic violence but also stated his desire to reunite and drew no connection between her aggression toward him and safety concerns for the children. The mother alleged the father had abused her emotionally, physically, and sexually during their marriage. She described instances of him becoming aggressive toward her when she would not give him prescription medications he wished to take. She also claimed he would let the air out of her tires to stop her from leaving and would purposely break things in their home. The mother described their relationship as "toxic." While the parents owned their own home at the time DHS became involved, the bank foreclosed on the family home soon after—though the father continued to stay at the property. The mother moved in with her parents after spending time in a jail and a halfway house early on in the juvenile proceedings. Each parent claimed to be engaged in services such as therapy but did not offer

---

[1] Additionally, the mother was diagnosed with a brain tumor in 2015. She underwent a number of brain surgeries. The mother had been a licensed pharmacist, but she lost her license and was unemployed as of June 2018.

reports or documentation to support their assertions. The father denied substance abuse but failed to do any of the drug testing requested of him.

In November 2019, the court established a guardianship in the maternal aunt and uncle. As of that time, the formal goal of the child-in-need-of-assistance (CINA) case was no longer to reunite J.R. and L.R. with the parents,[2] but the aunt and uncle, as well as professionals involved with the case, encouraged the parents to continue to engage in services with the hope they would reunify with the children in the future. And each parent continued to have scheduled visits with the children each week.

Shortly after, the father quit going to work and lost his job. He told professionals involved with the case that he was experiencing a lot of depression, but he continued to refuse mental-health therapy and treatment. With the loss of his job, the father also lost the company truck and cell phone he had.

In late March 2020, police reported the father and mother violated the no-contact order between them when the father went over to the mother's home and she let him inside. Once there, they argued over a cell phone, with the father eventually tackling the mother to the ground. He was arrested for domestic assault causing injury. DHS also received reports there was at least one other person staying at the father's home and that drugs were being used. When DHS reached out to the father, who had been released from jail, to visit the home, he responded aggressively, referring to the social worker's actions as "naïve" and "stupid" and telling her she was a "complete moron" with "[n]o common sense" who should

---

[2] The permanency goal was to "maintain guardianship."

"[m]ove the fuck on." Believing his response showed "a great deal of aggression and instability," DHS then suspended the father's visits with the children.

The father continued to violate the no-contact order and suffer legal repercussions as a result. His visits remained suspended. In contrast, by July 2020, the mother was having unsupervised visits with the children every Thursday through Sunday. The mother expressed fear of the father both on behalf of herself and for the children, which the professionals involved with the family seemed to share. A number of plans were put in place to keep the mother and children safe. For example, the mother agreed to clean out the garage so she could pull her car all the way in and close the garage door before she and the children would get out of the vehicle. Additionally, the children were not allowed to play in the front yard of the mother's home. And at the guardian ad litem's (GAL) request, the document stating when the children would be with the mother was filed at a higher security level on electronic document management system so the father would not know of their whereabouts through court filings.

In August, the father was arrested after he purchased a handgun, which he was not allowed to do as a person previously convicted of domestic assault causing injury and as the defendant under an active no-contact order.

The juvenile court held a permanency review hearing in November. In its written ruling, the court noted the father's pending criminal charges and that he had multiple outstanding warrants for his arrest. The father's whereabouts were unknown, and the court expressed "concern[] about the safety of the mother and the children from the father." Based on the mother's progress, the court changed the permanency goal back to reunification with the mother.

In keeping with this goal, the children began a trial home placement with the mother (at the home of the grandparents) on November 23. In authorizing it, the court ordered, "The mother shall not allow the father to have any unsupervised contact with the children; and she shall report immediately any attempts made by the father to circumvent the rules regarding visitation and to violate existing no contact orders." The DHS guidelines for the trial home placement also required the mother to "remain free from the use of all mood altering substances" and "comply with the no-contact order with" the father.

The trial home placement went well and, on February 9, 2021, the juvenile court returned custody of the children to the mother under the protective supervision of DHS.

Only sixteen days later, the mother allowed the father extended contact with the children, in violation of court orders. The mother's contact with the father also violated the no-contact order still in place. According to the mother's version of the events, on the afternoon of February 26, she and the children were driving in a vehicle when they happened upon the father walking along the road. The mother pulled over to allow the father to speak with the children. She then allowed the father to get into the car so the father could spend more time with them, driving him to the location of the children's appointment. When they arrived, she realized the appointment was previously cancelled and then reported as much to the father—telling him they had no other plans. They drove around more before going to a gas station and then ultimately to a home outside of town where the father said he was staying. When they got there, rather than dropping the father off, the mother and children went inside with him. They eventually stayed the night before

leaving around 10:00 a.m. the next morning. Less than twelve hours later, the father was arrested after leading officers on a high speed chase, with the father traveling as fast as 110 miles per hour. After he was apprehended, officers located a black bag that the father was believed to have thrown out of the vehicle during the chase. In it, the officers located hydromorphone and lorazepam pills, a "canister with white pills," the mother's debit card, and two knives.

The mother did not report the incident to the police or DHS. She later told her probation officer, but only after the father had already been arrested. After DHS learned of the incident, the mother was told both she and the children would be drug tested and not to alter the children's hair. The mother was tested and received a positive result for THC. Although expressly told not to, the mother dyed one of the children's hair before DHS was able to test them.

The court sua sponte scheduled a dispositional hearing for March 15. At the hearing, the county attorney, GAL, and the mother asked the court to leave the children in the mother's care. DHS supported removal.[3] The court modified the

---

[3] We cannot say this stance was clear at the time of the hearing. As far as we can tell DHS did not ask for the attorney general to represent it in the juvenile court, and nothing in the record shows DHS's opinion regarding the appropriate action was at odds with that of the county attorney. *See* Iowa Code § 232.114(3) (2021) ("If there is disagreement between [DHS] and the county attorney regarding the appropriate action to be taken, [DHS] may request that the state be represented by the attorney general in place of the county attorney. If the state is represented by the attorney general, the county attorney may continue to appear in the proceeding and may present the position of the county attorney regarding the appropriate action to be taken in the case.").

But on appeal the attorney general, acting as the State, represents DHS. *See In re C.Z.*, 956 N.W.2d 113, 115 (Iowa 2021) ("Normally, the State is represented by the county attorney in juvenile court and by the attorney general on appeal."); *see also* Iowa Code § 232.114(1) ("As used in this section, 'state' means the general interest held by the people in the health, safety, welfare, and

prior dispositional order, removing the children from the mother's custody. The mother appeals.

## II. Standard of Review.

"We review CINA proceedings de novo." *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). "In these proceedings, we are not bound by the juvenile court's fact findings; however, we do give them weight." *Id.* As always, "[o]ur primary concern is the children's best interests." *Id.*

## III. Discussion.

Here, following a full hearing, the juvenile court modified the dispositional order and transferred the children out of the mother's custody.[4] Because children

---

protection of all children living in this state."). And in its responsive brief, the State asserts,

> The Department of Human Services was supportive of removal below even though this likely did not get articulated on the record. Undersigned counsel, as an assistant attorney general, represents the interests of the State upon appeal as directed by the Department of Human Services. The Department supports modification of the dispositional order and removal of the children. As such, irrespective of any confusion which may have occurred below with relation to the State's position, upon appeal the State fully supports the juvenile court's order.

(Citation omitted.)

[4] The mother cites the legal standard for temporary removal. *See* Iowa Code § 232.95(2)(a) (allowing the court to order temporary removal if it "finds that substantial evidence exists to believe that removal is necessary to avoid imminent risk to the child's life or health"). But the children were not temporarily removed here. The court held a full hearing before ordering the children's removal and then modified the prior dispositional order following the hearing. *Cf. id.* § 232.95(1). And while the court filed an order for removal (which it titled "Order re: Temporary Removal/Modification) within one day of the hearing—presumably to memorialize the court's oral ruling at the end of the hearing—the court followed up about ten days later with a "detailed ruling" that included extensive findings of fact and credibility assessments. So, even if the initial order was a temporary removal order, the filing of the later modification order makes any issue with the removal order moot. *See, e.g., In re A.M.H.*, 516 N.W.2d 867, 871 (Iowa 1994) ("[W]e need not decide the validity of the ex parte removal order or the order entered after

should be allowed to remain at home with their parent "whenever possible," a transfer of custody requires a finding by the juvenile court that "(1) the child cannot be protected from physical abuse without transfer of custody; or (2) the child cannot be protected from some harm which would justify the adjudication of the child as a child in need of assistance and an adequate placement is available." Iowa Code § 232.102(4)(a). Plus, the juvenile court "must make a determination that continuation of the child in the child's home would be contrary to the welfare of the child, and shall identify the reasonable efforts that have been made." *Id.* § 232.102(4)(b). These determinations are made on a case-by-case basis. *Id.*

Additionally, pursuant to Iowa Code section 232.103(4), the court may modify a dispositional order if it finds any of the following circumstances exist:

> a. The purposes of the order have been accomplished and the child is no longer in need of supervision, care, or treatment.
> b. The purposes of the order cannot reasonably be accomplished.
> c. The efforts made to effect the purposes of the order have been unsuccessful and other options to effect the purposes of the order are not available.
> d. The purposes of the order have been sufficiently accomplished and the continuation of supervision, care, or treatment is unjustified or unwarranted.

The mother knows the father has ongoing mental-health and substance-abuse issues and was evading arrest for outstanding warrants. She repeatedly

---

hearing because this issue is moot. [After the removal order placed temporary custody of the child was DHS], [c]ustody of the child was placed with DHS under the dispositional order. Any error committed in granting the temporary ex part order cannot now be remedied. We cannot go back in time and restore custody based on alleged errors in the initial removal order."); *In re R.E.*, No. 10-1480, 2010 WL 4867960, at *1 (Iowa Ct. App. Nov. 24, 2010). Thus, because our review is not of a temporary removal order, we employ the standards for modification of a dispositional order.

expressed fear for her and the children's safety; a fear which it seems the professionals involved with the case and the court believed was warranted. The mother was not unaware of the harm the father could cause to the children. Yet almost immediately after custody of the children was returned to her, she knowingly and intentionally allowed the father to spend time with them.

The mother's testimony framed the nearly twenty-four hours spent with the father as an effort not to set him off. She described having a weak moment of wanting the children to see their father after accidently coming upon him and then quickly realizing she made a dangerous mistake. In this way, she likens her choice to a drug relapse. Some of the mother's explanation is plausible. The mother's testimony that the father took her phone sometime after they arrived at the home where he was staying and that she did not see a way to get herself and the children out of the house without putting them at risk is believable. But her testimony that she was scared almost immediately after allowing him into the car and just did not know how to end the interaction is not. After letting him get in, the mother drove them all to the children's therapist's office. She testified that once they got to the parking lot, she realized the appointment had been cancelled and told the father as much, stating, "[W]e don't have plans for rest of the evening anymore." She then drove the four of them to the gas station. The mother went inside without the father; she did not use her phone to alert anyone what was happening or try to get help from anyone inside the store. After she went back out to the vehicle, the father took one of the children in to use the restroom. The mother still took no steps to end the interaction. Then the father asked her to take him to the home

where he was staying; she did, and then she and the children voluntarily went into the home.

Ultimately, we agree with the juvenile court:

> [The mother] was well aware of the orders, and the reasons for the orders. She said she understood and agreed. Extensive steps were taken for months to protect her and the children from [the father]. The Court is presented with two possible and equally unacceptable explanations for her decisions and behavior. If the encounter with [the father] was by chance, [the mother] made a series of bad decisions and was unable or unwilling to get herself and the children out of a dangerous situation. If she agreed to meet [the father] and allow him to see the children, she violated court orders and lied under oath about it. Either way, [she] put the children's lives and safety in direct jeopardy.

As the mother asserts, a "relapse" on its own may not be reason to remove children from a parent's care. And the mother cites *In re P.H.*, No. 20-0372, 2020 WL 5650628, at *5 (Iowa Ct. App. Sept. 23, 2020) to support this claim. In *P.H.*, a panel of this court noted, "In cases where parents are honest about their usage, cooperative with DHS safety services, and are actively engaged in substance-abuse treatment, they may, with the help of family and service providers, be able to safely maintain their child in their home." 2020 WL 5650628, at *5. But like in *P.H.*, those are not the facts here. *Id.* ("These mitigating facts are not present in this case."). First, the mother neither told DHS about this incident nor immediately reported it to law enforcement. And other actions taken by the mother also hurt her credibility and our faith in the progress she claims she has made. She tested positive for THC after the incident and dyed one of the children's hair after being explicitly told not to so DHS could drug test the children as well. That the mother's debit card was found in the father's possession the next day—when he was

apparently going on the run to elude his outstanding warrants—is also unexplained.

We are also not convinced by the mother's argument the child are not at risk from harm while the father is in police custody. First, we have no way of knowing how long the father will remain in custody; throughout the juvenile proceedings, his stints in jail have been consistently short. Plus, the father's detention in jail alone, without strong assurances the mother appreciates her part in placing the children at risk, is not a compelling reason why she should keep custody of her children.

For all of the reasons we have outlined, we agree with the juvenile court that there is clear and convincing evidence that the children could not be protected from an adjudicatory harm if allowed to remain the mother's care and that continuation of the children in the mother's home would be contrary to their welfare. *See* Iowa Code § 232.102(4)(a), (b). Additionally, modification of the dispositional order was appropriate because "the efforts made to effect the purposes of the order have been unsuccessful and other options to effect the purposes of the order are not available." *See id.* § 232.103(4)(c). Therefore, we affirm the children's removal from the mother's care.

**AFFIRMED.**